**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

GARY WINGATE, # N-16101,      )
                                )
               Petitioner,      )
                                )
    vs.                      )       Case No. 16-cv-0087-NJR
                                )
RANDY PFISTER,             )
                                )
              Respondent.    )

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

In October 2006, Petitioner Gary Wingate was convicted of first-degree murder and aggravated discharge of a firearm, following a jury trial in St. Clair County, Illinois. *People v. Wingate*, St. Clair County Case No. 05-CF-1784. He is now serving a 50-year sentence at Stateville Correctional Center. On January 26, 2016, Wingate filed this action seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.

Wingate's Amended Petition (Doc. 7) raises four grounds for relief:

1. His trial counsel was ineffective for failing to locate and present a witness whose testimony would have been exculpatory;

2. The State failed to prove him guilty of first-degree murder beyond a reasonable doubt;

3. He was improperly denied a fitness hearing; and

4. He was actually innocent of first-degree murder because he was trying to protect himself and had no intent to kill.

(Doc. 7, pp. 8, 10, 12, 14). Wingate requests an order vacating his conviction and sentence and remanding his case for a new trial. (Doc. 7, p. 18). Alternatively, he seeks a sentence reduction. *Id.*

Respondent opposes issuance of the writ, arguing that Ground Two above was procedurally defaulted; Grounds One and Three cannot be relitigated because the state court's decision was legally and factually reasonable; and Ground Four is not cognizable in this proceeding. (Doc. 15, p. 7).

Wingate did not submit a reply to Respondent's answer, although he was given the opportunity to do so. (Doc. 17).

For the reasons discussed below, Wingate's Section 2254 Petition will be denied.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

**1.     Trial Proceedings**

This summary of the facts is derived from the detailed description by the Illinois Appellate Court, Fifth District, in its Rule 23 Order affirming Wingate's conviction on direct appeal (Doc. 16-1; *People v. Wingate*, No. 5-09-0267 (Oct. 21, 2010)), and its opinion affirming the dismissal of Wingate's post-conviction petition. (Doc. 16-2); *People v. Wingate*, 31 N.E.3d 275 (Ill. App. Ct. 2015). The state court's factual findings are presumed to be correct unless rebutted by clear and convincing evidence, which Wingate has not attempted to do. 28 U.S.C. § 2254(e).

Wingate was charged in connection with the shooting death of Darlene Russell in Washington Park, Illinois on November 1, 2005. (Doc. 16-1, p. 2). At Wingate's jury trial, Russell's husband, Andre Garrett, testified that he approached Wingate on the street on November 1, to speak with him about money Wingate owed to Russell. As Garrett approached, Wingate raised his fists and began to talk "crazy." *Id.* Garrett punched Wingate, knocking him out. Garrett then returned to his house.

Russell then went to speak with Wingate, and Garrett followed her, telling her to come back inside. (Doc. 16-1, p. 2). Garrett saw Wingate in a nearby yard, and he saw Torrian Hopkins

(who had been with Wingate during the first encounter) walking away across a field. Garrett called to Hopkins to stop and talk, but Hopkins refused. Garrett then heard gunfire, and saw Wingate on his knees, firing a weapon in Garrett's direction. Garrett and Russell ran to their house, and Russell was struck and killed by gunfire while on their porch. When Garrett reached Russell, he turned and saw Wingate fleeing through an alley carrying "a big rifle." *Id.*

Keith McNeal testified that on November 1, 2005, he was working on a car at the house next door to Wingate's. (Doc. 16-1, p. 2). He heard and saw Garrett and Wingate arguing about money. (Doc. 16-1, pp. 2-3). He went inside the house to get tools, and when he came out, he saw Wingate lying on the ground. When Wingate got up, he said he was "going to get" Garrett. (Doc. 16-1, p. 3).

Douglas Scott was also working on the car with McNeal. (Doc. 16-1, pp. 2-3). He saw Garrett punch Wingate, then saw Wingate get up after 10-15 minutes and go into his house. Wingate came out of his house carrying an "AK-47," then knelt and began shooting at Garrett. Wingate then fled, holding the rifle. (Doc. 16-1, p. 3).

Wingate testified that on November 1, 2005, he and Torrian Hopkins were standing outside Wingate's house when Garrett approached and asked whether he had the money he owed to Russell. (Doc. 16-1, p. 4). Wingate replied that he would pay as soon as his check arrived. When Wingate looked away briefly, Garrett struck him and knocked him out.

When Wingate regained consciousness, Garrett and Hopkins were gone. (Doc. 16-1, pp. 4-5). Wingate went to his house and retrieved his "assault rifle" because he assumed that Garrett, who was a "drug dealer," "loan shark," and was "known for carrying guns," had gone home to get a gun. (Doc. 16-1, p. 5). As Wingate stood by his fence holding the rifle, he saw Garrett emerge from his house and begin to walk toward Wingate. (Doc. 16-1, p. 5). Wingate stepped out into the

street to show Garrett that he was armed, but Garrett continued walking toward him. Although Wingate did not see a weapon in Garrett's possession, he began firing at Garrett in order to frighten him. He was not trying to hit Garrett. When Wingate started shooting, Garrett stopped walking. Wingate then stopped shooting. He saw Garrett "reach[] down his side like he was going in his pocket." *Id.* Suspecting that Garrett was reaching for a weapon and not wanting to wait until Garrett had the weapon in hand, Wingate began firing again. Garrett turned and ran towards his house but stopped and knelt between two vehicles in his driveway. Believing that Garrett was going to start shooting at him, Wingate continued to fire in the direction of the vehicles. At that point, Wingate was trying to hit Garrett but was acting out of fear for his own safety and a desire to defend himself. Wingate never saw Russell at any point. After he stopped shooting, Wingate ran down the alley and to a nearby abandoned house, where he left the assault rifle. He then went to a friend's house in East St. Louis, where he was arrested the next day. (Doc. 16-1, p. 5).

The jury was instructed on both self-defense and second-degree murder, under both the serious-provocation prong and the unreasonable-belief prong, as well as first-degree murder and aggravated discharge of a firearm. They found Wingate guilty of first-degree murder and aggravated discharge of a firearm. (Doc. 16-1, p. 5).

## 2.    Post-Trial Motions and Sentencing

In November 2006, Wingate filed a post-trial motion (which he later amended), arguing that the State failed to prove him guilty beyond a reasonable doubt; his trial counsel was ineffective for failing to call Torrian Hopkins, who could have testified that Garrett was armed when he approached Wingate; and that counsel was ineffective for failing to argue that Wingate was unfit to stand trial. (Doc. 16-1, p. 6). He also filed a petition seeking a fitness determination; in response, the trial court appointed an expert to examine Wingate.

4

On November 12, 2008, the trial court held a hearing on Wingate's fitness and his allegations of ineffective assistance. Wingate testified that he was "hearing voices" and "seeing things" at the time of the trial, and introduced doctors' reports from 2003 and 2004 indicating he suffered from major depression and schizoaffective disorder. (Doc. 16-1, p. 6). He testified that he had told his lawyer that Hopkins had witnessed the incident with Garrett, but she failed to contact Hopkins.

The court-appointed psychologist opined that Wingate was feigning his symptoms, and had been fit at the time of the trial. (Doc. 16-1, pp. 6-7). Wingate's trial attorney testified that Wingate had been unable to provide her with contact information for Torrian Hopkins, and that she believed Hopkins would not be able to provide helpful testimony because he had already left the scene by the time Garrett approached Wingate the second time. (Doc. 16-1, p. 7). The trial court denied Wingate's petition for a fitness determination, finding that he had been fit to stand trial. Further, the court found that Wingate's trial counsel had not been ineffective for failing to pursue Hopkins as a witness. *Id.*

In February 2009, Wingate filed an amended post-trial motion, stating that he had newly-discovered evidence supporting his claim of self-defense. (Doc. 16-1, p. 7). He attached an affidavit from Torrian Hopkins, in which Hopkins stated that after Garrett knocked Wingate to the ground, Garrett went into his house and emerged with a gun in his hand. Wingate went and got his own rifle only after he saw Garrett's gun. (Doc. 16-1, p. 8). A hearing was held on this motion in March 2009. Hopkins testified that after Garrett and Wingate argued about money, Garrett punched Wingate and knocked him down. Hopkins helped Wingate up while Garrett went into his house. Hopkins started walking away; he then saw Garrett come back out of his house carrying something that appeared to be a gun. (Doc. 16-1, p. 8). Hopkins continued walking, heard some

gunshots, and then "struck off" across the street. Hopkins stated on cross-examination that he had not seen a gun, but had "assumed" that Garrett had a gun, and other people had said that Garrett had a gun. *Id.* The trial court denied Wingate's motion, finding that Hopkins's testimony would not lead to a different verdict on retrial, and Wingate's other claims did not warrant a new trial. *Id.*

On April 20, 2009, Wingate was sentenced to a 50-year term of imprisonment. His motion to reconsider the length of sentence was denied. (Doc. 16-1, p. 8).

**3.  Direct Appeal**

Wingate's appellate counsel filed a motion for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), because the appeal lacked merit. (Doc. 16-1, p. 1; Doc. 16-3). Wingate filed a response. (Doc. 16-4).

The only issue briefed by appellate counsel was whether the court erred in denying Wingate a new trial based on Hopkins's newly-discovered testimony. (Doc. 16-1, pp. 8-9). The appellate court agreed that Hopkins's testimony was "not of such a conclusive character that it would probably change the result on a retrial." (Doc. 16-1, p. 9). While Hopkins's affidavit averred that he saw Garrett with a gun before Wingate fired shots, Hopkins admitted at the post-trial motion hearing that he "didn't have a visual" and "assumed" that Garrett had gone to his house to get a gun. Furthermore, Wingate had admitted at trial that he never saw a gun in Garrett's hand. *Id.*

Wingate, in his *pro se* response, argued that he had meritorious claims that his counsel had been ineffective for failing to call Hopkins as a witness and failing to argue his unfitness, that he had not been fit to stand trial, and that the 50-year sentence was an abuse of discretion. (Doc. 16-1, p. 10). The appellate court found no reason to disturb the trial court's findings on these matters. (Doc. 16-1, pp. 10-12).

Wingate's petition for leave to appeal ("PLA") to the Illinois Supreme Court was denied

on September 28, 2011. (Docs. 16-5, 16-6).

**4.     Postconviction Petition and Appeal**

On October 20, 2011, Wingate filed a *pro se* petition for post-conviction relief, claiming that newly-discovered evidence showed his actual innocence. (Doc. 16-2, p. 6). He attached an affidavit of Jeff Mosley, who claimed that he witnessed the first encounter between Garrett and Wingate and saw Garrett strike Wingate twice in the face with a silver handgun, knocking him down. Mosley saw Garrett go into his house and return with a gun in his hand. Garrett raised "his gun in the direction of" Wingate, Wingate began to fire, and Garrett ran back toward his house and "ducked in between his trucks in the driveway." *Id*. Mosley delayed coming forward for several years because he was a "close friend" of Garrett and Russell and averred that it was "impossible" for Wingate to know he had witnessed the incident because of "all the commotion" between Wingate and Garrett. *Id*.

Wingate's appointed post-conviction counsel amended the petition to include claims of ineffective assistance of trial counsel for failing to locate Mosley prior to trial. The State moved to dismiss, and the motion was granted after a hearing on March 20, 2013. (Doc. 16-2, p. 6).

The appellate court affirmed, finding that Mosley's evidence would merely impeach Garrett's testimony that he had never owned or carried a gun, thus it was not of such conclusive character that it would probably change the result on retrial. (Doc. 16-2, p. 7). Further, Mosley's affidavit could not be considered "newly discovered" evidence, because Wingate did not demonstrate that he could not have discovered it earlier through due diligence. (Doc. 16-2, pp. 7-9). Finally, the appellate court determined that Mosley's proffered evidence would not demonstrate Wingate's actual innocence, because at most, it would reduce his liability from first-degree murder to second-degree murder. (Doc. 16-2, pp. 9-10).

7

Wingate's PLA (Doc. 16-10) was denied by the Illinois Supreme Court on September 30, 2015. (Doc. 16-11).

**LAW APPLICABLE TO SECTION 2254 PETITION**

**1.      Substantive Law**

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act, known as the AEDPA. "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Habeas is *not* merely another round of appellate review. 28 U.S.C. § 2254(d) restricts habeas relief to cases where the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman*, 690 F.3d at 814 (quoting *Williams*, 529 U.S. at 407).

Federal habeas review serves as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979)

8

(Stevens, J., concurring)). Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "A state court's decision is reasonable, even if incorrect in our independent judgment, so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017) (internal citations omitted.)

The Supreme Court has repeatedly emphasized that the Section 2254(d) standard "is intentionally 'difficult to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014), and *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, the state court application must be "objectively unreasonable," meaning "something like lying well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003). (internal citations omitted).

2.     **Timeliness, Exhaustion, and Procedural Default**

In addition to the requirement for timely filing under the AEDPA, a habeas petitioner must clear two procedural hurdles before the Court may reach the merits of his habeas corpus petition: exhaustion of remedies and procedural default. *Bolton v. Akpore*, 730 F.3d 685, 694-696 (7th Cir. 2013). Before seeking habeas relief, a petitioner is required to bring his claim(s) through "one complete round of the State's established appellate review process" because "the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 845 (1999); *see also* 28 U.S.C. § 2254(c). Under the Illinois two-tiered appeals process, petitioners such as Wingate must fully present their claims not only to an intermediate appellate court, but also to the Illinois Supreme Court, which offers discretionary review in cases such as this one. *Id*.

Respondent concedes that Wingate has exhausted his state court remedies. (Doc. 15, p. 7). He does not contest Wingate's assertion that the habeas Petition was timely filed, but argues that habeas relief is not available, in part because of the procedural default of Ground Two. (Doc. 15, pp. 7-16).

ANALYSIS

**1.    Ground One – Trial Counsel Failed to Locate Exculpatory Witness**

Wingate's Petition does not specify whether this claim is based on his trial counsel's failure to call Torrian Hopkins as a witness regarding Hopkins's belief that Garrett had a gun during his second encounter with Wingate; whether it is based on counsel's failure to locate Jeff Mosley and obtain his testimony about observing the altercation between Garrett and Wingate; or both. (Doc. 7, pp. 8-9). Respondent confines his argument to the matter of Hopkins's potential testimony, asserting that Wingate failed to preserve for review the question of whether counsel was ineffective for failing to obtain Mosley's testimony at trial. (Doc. 15, p. 10-11).

Wingate fully litigated the claim of ineffective assistance regarding Hopkins's testimony through direct review by the Illinois Appellate Court and by inclusion of the issue in his PLA. He first raised the matter of the Mosley testimony in his state post-conviction petition as a claim for actual innocence, and appointed counsel amended the petition to include a claim for ineffective assistance of trial counsel for failure to locate Mosley. (Doc. 16-2, p. 6). The trial court rejected both arguments. Wingate's appellate brief challenging the dismissal of his petition focused only

on the actual innocence claim. (Doc. 16-7). As a result, the Illinois Appellate Court was not presented with the issue of whether counsel was ineffective for failing to locate Mosley for the trial. In light of this, Respondent is correct in concluding that Wingate has failed to preserve this aspect of his claim for habeas review. A habeas petitioner's "failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). This Court shall therefore examine only the matter of Hopkins's potential testimony.

A claim of ineffective assistance of counsel must be analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). Analysis under *Strickland* and on habeas review under Section 2254 are both highly deferential. Where, as here, both apply, the review is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Further, because *Strickland* sets forth a general standard, "the range of reasonable applications is substantial." *Ibid.*

In order to show ineffective assistance of counsel under *Strickland*, a petitioner must demonstrate (1) that counsel's performance "fell below an objective standard of reasonableness" ("the performance prong"), and (2) "that the deficient performance prejudiced the defense" ("the prejudice prong"). *Strickland*, 466 U.S. at 687-88. A petitioner must satisfy *both* prongs of the *Strickland* analysis to be eligible for habeas relief. There is no mandatory order for the analysis, however, and a habeas court is not required to address both prongs if the petitioner has failed to make a sufficient showing on one. *Id*. at 697.

Under *Strickland's* performance prong, a court inquires into "the objective reasonableness of counsel's performance." *Harrington*, 562 U.S. at 110. "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Id.* There is a strong presumption of adequate assistance and the exercise of reasonable professional judgment to avoid the temptation

to second-guess counsel's assistance. *Id.* at 107-08. Indeed, a petitioner's right to effective assistance of counsel is violated only when counsel's conduct, in light of all the circumstances, "[was] outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

With respect to prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Ultimately, "[t]he focus of the *Strickland* test for prejudice … is not simply whether the outcome would have been different; rather, counsel's shortcomings must render the proceeding fundamentally unfair or unreliable." *Gray v. Hardy*, 598 F.3d 324, 331 (7th Cir. 2010).

This Court's task is to determine whether the state court's decision was contrary to or an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). The relevant state court decision is the decision of the last state court to consider the issues raised in the habeas petition. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006). On this issue, that is the decision of the Illinois Appellate Court affirming Wingate's conviction on direct appeal. (Doc. 16-1).

After determining that the trial court did not abuse its discretion in denying Wingate's motion for new trial based on the newly discovered evidence of Hopkins's testimony, the appellate court addressed Wingate's ineffective assistance claims. The court correctly identified *Strickland* as the applicable Supreme Court precedent regarding claims of ineffective assistance and recognized that the *Strickland* two-pronged test requires a defendant to demonstrate both deficient performance by counsel and resulting prejudice, in order to prevail. (Doc. 16-1, p. 11). The court had already determined that "it is improbable that Hopkins's testimony would have changed the

result on retrial," because Hopkins was equivocal on the key issue of whether Garrett had a gun. (Doc. 16-1, p. 9). In contrast to his affidavit claiming that he had seen Garrett with a gun before Wingate began shooting, Hopkins admitted in the post-trial motion hearing that he "didn't have a visual" and "assumed" that Garrett had retrieved a gun. This uncertainty, coupled with Wingate's own admission at trial that he never saw a gun in Garrett's hand, led to the appellate court's conclusion that there was no reasonable probability that the outcome of the proceedings would have been different if trial counsel had called Hopkins to testify before the jury. Wingate could therefore not demonstrate that he was prejudiced by counsel's alleged error, which defeated his ineffective-assistance claim. *Id.*

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). The question for this Court is not whether it believes that trial counsel was ineffective. Rather, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. The Supreme Court in *Harrington* emphasized that the unreasonable application standard is a difficult one to meet, by design. Section 2254, as amended by AEDPA, "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further." *Harrington*, 562 U.S. at 102.

The Seventh Circuit has observed that "the bar for establishing the unreasonableness of a state court's application of *Strickland* 'is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus.'" *Jones v. Brown*, 756 F.3d 1000, 1007 (7th Cir. 2014) (citing *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009)). Here, Wingate does not come close to clearing the bar. The Illinois Appellate Court reasonably applied the correct Supreme Court

precedent in assessing the merits of Wingate's ineffective assistance claim based on his counsel's failure to call Hopkins as a witness. The court's conclusion that trial counsel was not ineffective in failing to obtain Hopkins's testimony at trial was well within the boundaries of permissible differences of opinion among fairminded jurists in applying *Strickland*. *See Harrington*, 562 U.S. at 102.

Wingate is not entitled to habeas corpus relief on Ground One.

## 2.    Ground Two – Failure to Prove Guilt Beyond a Reasonable Doubt

Wingate's Petition includes no argument on this point, but merely says, "State failed to prove Defendant guilty beyond a reasonable doubt of the charges of first-degree murder." (Doc. 7, p. 10).[1] Respondent asserts that this ground was procedurally defaulted. (Doc. 15, pp. 7-10).

On direct appeal, Wingate did not argue in his *pro se* response to his counsel's *Anders* brief that he was not proven guilty beyond a reasonable doubt (Doc. 16-4), nor did counsel raise that issue. (Doc. 16-3). Wingate's *pro se* PLA likewise raised only the issues of his fitness to stand trial and ineffectiveness of trial counsel for failing to investigate potential testimony from Torrian Hopkins. (Doc. 16-5).

Wingate's post-conviction proceedings focused on his claim of actual innocence based on the Jeff Mosley affidavit. (Docs. 16-7, 16-9, 16-10). He did not assert a claim that the State's evidence at trial failed to prove him guilty beyond a reasonable doubt.

Because Wingate did not present Ground Two to the state courts at all, his claim that he was not proven guilty of first-degree murder beyond a reasonable doubt is procedurally defaulted.

---

[1] Wingate, perhaps inadvertently, attached to his amended Petition the State's Brief and Argument from his post-conviction appeal.  (Doc. 7, pp. 19-31). To the extent they are relevant, Wingate's own appellate briefs were submitted by the Respondent as part of the record of proceedings in the state courts. (Docs. 16-4, 16-5, 16-7, 16-9, and 16-10). In any event, Wingate sets forth no new argument in the instant Petition (Doc. 7) to support his grounds for habeas relief.

*See O'Sullivan v. Boerckel*, 526 U.S. 838, 842-45 (1999) (habeas petitioner must bring his claims through "one complete round of the State's established appellate review process"). This defaulted argument cannot be considered on habeas review unless Wingate demonstrates cause for his default and prejudice, or that failure to consider his arguments will result in a miscarriage of justice. *See Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Gladney v. Pollard*, 799 F.3d 889 (7th Cir. 2015); *Perruquet v. Briley*, 390 F.3d 505, 514-515 (7th Cir. 2004). Wingate has not submitted any argument in an attempt to show cause and prejudice or that a miscarriage of justice would result if his reasonable doubt claim is not considered.

A habeas petitioner must meet the demanding *Schlup* standard for a claim of actual innocence in order to overcome a procedural default under the "miscarriage of justice" exception. *See McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013); *Schlup v. Delo*, 513 U.S. 298 (1995). Thus, Wingate "must convince the court that no reasonable juror would have found him guilty but for the error(s) allegedly committed by the state court." *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) (citing *Schlup*, 513 U.S. at 327-29). Wingate does assert an actual innocence claim under Ground Four of the Petition, where he states he was innocent because he "had no intentions on committing [the] act of murder … [and] was only trying to protect himself." (Doc. 7, p. 14). Respondent correctly points out (Doc. 15, p. 9) that in order to establish actual innocence under *Schlup*, a habeas petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," *Schlup*, 513 U.S. at 324, and that the new evidence must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006).

While Wingate's Petition does not explain what evidence he relies on for his actual innocence claim (Doc. 7, pp. 14-15), he twice attempted to bring new purported eyewitness evidence before the trial court: the accounts of Torrian Hopkins and Jeff Mosley. Neither witness testified at the trial, but the trial court had the opportunity to hear Hopkins testify in a later hearing. The state courts determined that Hopkins's proffered testimony would not have changed the outcome of the trial. (Doc. 16-1, pp. 8-9). Further, the courts found that based on Mosley's affidavit, his likely testimony could, at most, have reduced Wingate's liability from first-degree to second-degree murder, but would not have led to an outright acquittal—and thus would not show Wingate was actually innocent. (Doc. 16-2, pp. 6-7, 9-10). This Court agrees with the state courts' conclusions that the "new evidence" from Hopkins and Mosley, even if they had testified at trial, would not have met the *Schlup* standard to establish Wingate's actual innocence. When considered in light of the other evidence in the record, the accounts of Hopkins and Mosley, even taken together, would not have made it more likely than not that no reasonable juror would have found Wingate guilty beyond a reasonable doubt.

For these reasons, Ground Two does not entitle Wingate to habeas relief.

**3.    Ground Three – Denial of Fitness Hearing**

Wingate sets forth this claim by stating, "Under Mitchell, Defendant was never given, or afforded fitness hearing when there was a bona fide doubt." (Doc. 7, p. 12). He does not include any citation to "Mitchell," nor does he articulate any argument to flesh out this ground for relief.

The Court presumes that Wingate intended to reference the Illinois Supreme Court opinion in *People v. Mitchell*, 727 N.E.2d 254 (2000). That case concerned whether a state post-conviction petitioner who had been taking a psychotropic drug at the time of his trial should have been given a fitness hearing. The *Mitchell* court explained that a defendant's ingestion of psychotropic

medication alone did not establish a "bona fide doubt" regarding his fitness, and held that the denial of a fitness hearing under Section 104-21(a)[2] was not in and of itself a due process violation, overruling earlier precedent. *Mitchell*, 727 N.E.2d at 264. The court then discussed *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S.162 (1975), to clarify that a fitness hearing is required where evidence establishes a bona fide doubt of the defendant's competence to stand trial. *Mitchell*, 727 N.E.2d at 264-65. In this federal habeas corpus proceeding, however, the relevant inquiry is not whether the Illinois courts complied with *Mitchell* or any other state court decision or statute, but whether the Illinois courts' decisions were contrary to, or an unreasonable application of, *federal* law as set forth by the Supreme Court. *See* 28 U.S.C. § 2254(d).

As summarized above, Wingate raised the matter of his fitness in a post-trial motion and a petition for a fitness determination. (Doc. 16-1, p. 6). Medical reports from 2003 and 2004 indicated that Wingate had suffered from major depression and schizoaffective disorder, and he claimed to have been "hearing voices" and "seeing things" at the time of his trial in 2006. The court-appointed expert who examined Wingate in May 2008 concluded that he was feigning his psychiatric symptoms, and that at the time of his trial, Wingate had been able to understand the nature and purpose of the proceedings against him and was able to assist in his own defense. (Doc. 16-1, pp. 6-7). Wingate's trial counsel testified that she at no time observed anything about his demeanor that would lead her to suspect any bona fide doubt regarding his fitness to stand trial. (Doc. 16-1, p. 7). Based on the above testimony and documentation, the trial court found that Wingate had been fit to stand trial and denied his petition for a fitness determination. *Id.*

---

[2] The Illinois statute in force at the time of Mitchell's trial stated, "A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." Ill. Rev. Stat. Ch. 38, para. 104-21(a) (1989). The statute has since been amended (well before Wingate's criminal prosecution) to provide: "A defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications." 725 ILCS 5/104-21(a).

In Wingate's response to his appellate attorney's *Anders* brief in his direct appeal, he argued that he had not been fit to stand trial. (Doc. 16-4, pp. 5-6). The Illinois Appellate Court concluded that nothing in Wingate's medical reports "indicated that Wingate was unable to understand the nature and purpose of the proceedings against him or assist in his own defense, and Wingate introduced no other evidence at the hearing which would support that finding." (Doc. 16-1, p. 10). The court-appointed expert who examined Wingate and reviewed his medical records "opined that at the time of his trial, Wingate had been able to understand the nature and purpose of the proceedings against him and to assist in his own defense." *Id.* In light of this record, the appellate court held that the trial court's determination that Wingate had been fit to stand trial was not contrary to the manifest weight of the evidence. *Id.*

The Illinois Appellate Court decision did not reference any Supreme Court precedent in reaching its decision on this matter, but it correctly summarized the relevant standard that has been articulated by the high court—whether Wingate was "able to understand the nature and purpose of the proceedings against him and to assist in his own defense." (Doc. 16-1, p. 7). *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) ("A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.'") (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *Newman v. Harrington*, 726 F.3d 921, 929 (7th Cir. 2013) (standard for assessing competency to stand trial under Illinois law comports with the test set forth in *Dusky v. United States*). Thus, the Illinois Appellate Court adjudicated the merits of Wingate's claim of unfitness to stand trial using the correct legal standard.

Wingate is not entitled to habeas relief on this ground unless he can demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly

established federal law" (28 U.S.C. § 2254(d)(1)), or if the decision was "based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U.S.C. § 2254(d)(2). He makes no such showing.

In the absence of any argument set forth by Wingate, this Court looks to the state court record and the appellate court's decision. The trial court considered Wingate's medical reports and his own testimony regarding his mental condition and memory of his ability to understand the trial proceedings (Doc. 16-14, pp. 5-7); the testimony of the expert who examined him (Doc. 16-14, pp. 7-12); and his trial counsel's testimony (Doc. 16-14, pp. 12-14), and concluded that Wingate had been fit to stand trial. Neither this decision nor the appellate court's concurrence indicates an unreasonable application of the fitness standard as explained by the Supreme Court, a decision contrary to Supreme Court precedent, or an unreasonable determination of the facts. To the extent that Wingate may have been diagnosed with depression and schizoaffective disorder at some time prior to his trial, "[t]he fact that a person suffers from a mental illness does not mean that he's incompetent to stand trial. He need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions ...." *Price v. Thurmer*, 637 F.3d 831, 833-34 (7th Cir. 2011) (citing *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Dusky v. United States*, 362 U.S. 402 (1960)).

The state courts' conclusion that Wingate understood the trial proceedings and was able to assist in his defense falls well within the range of permissible differences of opinion among fairminded jurists. *See McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017); *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003). He cannot be granted habeas relief under Ground Three.

#### 4. Ground Four – Actual Innocence

As with his other grounds, Wingate includes no supporting argument or authority relating to his claim of actual innocence. He merely states: "Defendant had no intentions on committing act of murder. Defendant was only trying to protect himself." (Doc. 7, p. 14). Respondent asserts that this claim is not cognizable in this habeas proceeding. (Doc. 15, pp. 7-8).

Respondent is correct in noting that a claim of "actual innocence" is not a freestanding federal constitutional claim which may lead to habeas corpus relief. Instead, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."[3] *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *see also Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018) ("neither the Supreme Court nor this court has yet indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-capital case"); *Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018). Based on this precedent, Wingate's claim that he was actually innocent because he had no intent to kill and was acting in self-defense does not warrant relief in this habeas action.

For these reasons, Wingate is not entitled to habeas corpus relief on any of the grounds raised in his Petition. The Petition will be denied, and this action will be dismissed with prejudice.

---

[3] This is why the Court considered Wingate's "actual innocence" claim under Ground Two (whether the State failed to prove Wingate guilty beyond a reasonable doubt), to determine whether the assertion of actual innocence was sufficient to overcome that procedurally defaulted claim.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

In order for a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Buck v. Davis*, 137 S. Ct. 759, 773 (2017).

Here, no reasonable jurist would find it debatable whether this Court's rulings on the merits of Wingate's claims are correct. Accordingly, the Court denies a certificate of appealability.

### CONCLUSION

Wingate's Amended Petition for habeas relief under 28 U.S.C. § 2254 (Doc. 7) is **DENIED**. This entire action is **DISMISSED WITH PREJUDICE**. The Clerk of Court shall enter judgment accordingly.

If Wingate wishes to appeal the dismissal of this action, his notice of appeal must be filed with this Court within 30 days of the entry of judgment. FED. R. APP. P. 4(a)(1(A). A motion for leave to appeal *in forma pauperis* ("IFP") must set forth the issues Wingate plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If Wingate does choose to appeal and is allowed to proceed IFP, he will be liable for a portion of the $505.00 appellate filing fee (the amount to be determined based on his prison trust fund account records for the past six months) irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998). A proper and timely motion filed pursuant to Federal

Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline. FED. R. APP. P. 4(a)(4). A Rule 59(e) motion must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended. Other motions, including a Rule 60 motion for relief from a final judgment, do not toll the deadline for an appeal.

**IT IS SO ORDERED.**

**DATED: January 14, 2019**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**